# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
A 2018 Gray Ford Explorer bearing VIN number 1FM5K7D87JGB28071, currently located at 9201 N. 107th Street, Milwaukee, Wisconsin ("Subject Vehicle 3"), as further described in Attachment A.

Case No. 24-890M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before September 17, 2024 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 03/02/2025.

Date and time issued: 9/3/2024 @ 11:49 a.m.

[signature: Nancy Joseph]
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| --- | --- | --- |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

*Executing officer's signature*

*Printed name and title*

# ATTACHMENT A

***Property to be Searched***

The property to be searched is a Gray 2018 Ford Explorer, bearing VIN number 1FM5K7D87JGB28071, currently located at 9201 N. 107th Street, Milwaukee, Wisconsin ("**Subject Vehicle 3**").

This warrant authorizes, *inter alia*, the forensic examination of **Subject Vehicle 3**'s infotainment and telematics systems for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be Seized*

All electronically stored information on **Subject Vehicle 3**'s infotainment and telematics systems described in Attachment A, that involves Marcel OXLEY Sr., Christian FRAZIER, Vincent NICHOLSON, Tamera MONTGOMERY, and other DTO members who are known and unknown, and relates to violations of Title 21, United States Code, Sections 841(a)(1) (Attempted possession with intent to distribute controlled substances) and 846 (Conspiracy to distribute and possess with intent to distribute controlled substances) from July 30, 2021 through June 21, 2024, including:

1. Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within **Subject Vehicle 3**, including, but not limited to:

    a. unique device identifiers;

    b. media files;

    c. call logs;

    d. contacts;

    e. SMS;

    f. Bluetooth connections;

    g. USB connections;

    h. voice commands;

    i. voice recordings;

    j. voice calling;

    k. web browser history;

l. Wi-Fi connections;

m. speech recognition;

n. time updates;

o. track logs;

p. traction events;

q. traffic updates;

r. stop/start log;

s. GPS warnings;

t. hard acceleration;

u. hard braking;

v. light status;

w. odometer reading;

x. gear shifts;

y. historical navigation data;

z. historical speed data;

aa. historical event data; and

bb. data streaming services and related content.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2018 Gray Ford Explorer bearing VIN number 1FM5K7D87JGB28071, currently located at 9201 N. 107th Street, Milwaukee, Wisconsin ("Subject Vehicle 3"), as further described in Attachment A.

Case No.24-890M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution of and conspiracy to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of ____ days *(give exact ending date if more than 30 days:* 03/02/2025 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KOSTANDEAN KAZAMIAS Digitally signed by KOSTANDEAN KAZAMIAS Date: 2024.08.30 13:20:30 -05'00'

*Applicant's signature*

Kostandean P. Kazamias, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 9/3/2024 @ 11:49 a.m.

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Kostandean P. Kazamias, being first duly sworn, hereby depose and state a follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the search for and seizure of electronically stored information, as particularly described in Attachment B, within a **2018 Gray Ford Explorer** bearing VIN number **1FM5K7D87JGB28071**, currently located at 9201 N. 107th Street, Milwaukee, Wisconsin ("**Subject Vehicle 3**"), a description of which is contained in Attachment A.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since 2020. I am currently assigned to the Milwaukee District Office, Group 63. My duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. §§ 1956 and 1957. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, and Section 2516.

3. As a Special Agent, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. I have also participated in

the investigation of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become aware of the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am also familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I am familiar with the street names of various drugs, including fentanyl, heroin, and cocaine. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the State of Wisconsin and elsewhere.

4. As a narcotics investigator, I have participated in many aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, analysis of phone records, and the arrests of numerous drug traffickers. I have worked with numerous informants in the investigation of drug trafficking in the State of Wisconsin and elsewhere. I have directed informants during controlled buys of controlled substances. I have participated in the execution of numerous state and federal search warrants in which controlled substances, drug paraphernalia, drug proceeds, drug-related records, financial records, and electronic devices with data were seized. I know that drug traffickers commonly have in their possession, and at their residences

and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such. I have also been the affiant of many search warrants. I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances.

5. Based on my training, experience, and participation in drug trafficking investigations, I am aware that individuals who are involved in the use and distribution of controlled substances often facilitate their criminal activities through the use of telephones and social media, and that the records related to such tools often provide information pertaining to drug trafficking, including but not limited to the identity of subjects and targets involved in the use and distribution of controlled substances, the scope, identity, hierarchy, and overt acts in furtherance of the drug conspiracy, and the means of storing, concealing, and distributing controlled substances or drug proceeds. I also know that it is common for drug traffickers to use their vehicles to store, secrete, and otherwise possess various indicia of drug trafficking.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who

have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

## PROBABLE CAUSE

8. My basis for believing that evidence is located within **Subject Vehicle 3**, including the infotainment and telematics systems, is as follows:

9. The Drug Enforcement Administration (DEA) and the North Central High Intensity Drug Trafficking Area (HIDTA) are currently investigating the drug trafficking activities of a multi-state Drug Trafficking Organization (DTO). During the course of the investigation case agents have identified multiple individuals involved in supplying multi-kilogram quantities of narcotics to Milwaukee, Wisconsin, and other areas. Evidence gathered during the course of this investigation reflects that Cornel C. CARNEGIE and Marcel D. OXLEY SR. are responsible for and coordinating the movement of multi-kilogram quantities of narcotics from California. The evidence further reflects that Aurion M. OXLEY, Tamera D. MONTGOMERY, Marcel D. OXLEY JR., Vincent L. NICHOLSON JR., and others work with OXLEY SR. and CARNEGIE to facilitate the movement of narcotics to and store narcotics at various stash locations in Milwaukee, Wisconsin. Case agents have discovered that at least some of the narcotics are transported via commercial airlines from California to Chicago, Illinois, and then to Milwaukee, Wisconsin. The narcotics are then supplied to multiple individuals in the Milwaukee area, to include Anthony T. WILKS, who distributes the narcotics from the restaurant and bar he operates known as Jack's Executive Bistro, located at 4923 W.

Villard Avenue, Milwaukee, Wisconsin.[1]

**Source Information**

10. From June 2023 through October 2023, case agents conducted several interviews with SOI #1. SOI #1 told case agents that various members in the DTO are smuggling kilogram quantities of various types of controlled substances, including fentanyl, crystal methamphetamine, heroin, and cocaine, on commercial airlines from California to Chicago O'Hare International Airport (ORD) by paying TSA agents to get the narcotics through airport security. More specifically, according to SOI #1, DTO members give the narcotics to TSA agents outside of the airport, typically in a black Swiss Gear backpack, and the TSA agents then bring the narcotics in the black Swiss Gear backpack through security. The TSA agents then give the backpack containing the narcotics to a different member in the DTO who is scheduled to take the flight and who has already gotten through airport security. Once the narcotics arrive in Chicago, SOI #1 stated that a courier transports the narcotics to Milwaukee, Wisconsin, typically in an Uber. According to SOI #1, the DTO facilitates weekly narcotics trips from California to ORD, and the DTO keeps TSA agents on "payroll" for the DTO.

11. SOI #1 further stated that, in much the same fashion, the DTO uses commercial airlines from ORD to California to facilitate the movement of drug proceeds in the form of bulk cash U.S. currency. SOI #1 stated that in 2022, on various occasions,

[1] On or about July 30, 2024, Jack's Executive Bistro was permanently closed.

SOI #1 went to ORD with a black Swiss Gear backpack containing drug proceeds. SOI #1 stated that SOI #1 has gone to ORD with MONTGOMERY, OXLEY SR., OXLEY JR. (OXLEY SR.'s son), Aurion OXLEY (OXLEY SR.'s daughter), and NICHOLSON JR. (NICHOLSON). SOI #1 stated that when SOI #1 arrived at ORD, a TSA employee met SOI #1 and SOI #1's associates at the vehicle they arrived in and took the black Swiss Gear backpack containing the drug proceeds. The TSA employee took the backpack containing drug proceeds through security and gave it to another DTO member who subsequently transported it to California. Additionally, SOI #1 stated that the TSA employee would receive a few thousand U.S. dollars as payment for transferring the backpack containing the drug proceeds to the airline passenger involved with the DTO.

12. Law enforcement records reflect that bulk U.S. currency was seized from various DTO members at an airport in 2018. More specifically, on May 18, 2018, at the Cincinnati/Northern Kentucky International Airport in the B Concourse, case agents from DEA Cincinnati RO and the Cincinnati/Northern Kentucky Airport Police Department reviewed flight manifests and discovered suspicious flight itineraries for OXLEY SR., Aurion OXLEY, and Rosie ANDERSON. Case agents engaged in a consensual encounter with these three individuals and stated they were looking for weapons, narcotics, or large sums of money travelling though the airport. Case agents asked OXLEY SR., Aurion OXLEY, and ANDERSON if officers could search their luggage, and all three individuals consented to the search. During the search of OXLEY SR., Aurion OXLEY, and ANDERSON, case agents located U.S. currency in a large white

envelope on each of them. Case agents seized approximately $27,469 U.S. dollars in total from OXLEY SR. ($7,715), Aurion OXLEY ($8,814), and ANDERSON ($10,940).

13. SOI #1 stated that SOI #1 has been to Jack's Executive Bistro approximately four times in the past to facilitate the distribution of multi-kilogram quantities of cocaine and to pick up drug proceeds. Case agents displayed a Wisconsin Department of Transportation photo of Anthony T. WILKS to SOI #1, and SOI #1 positively identified the individual depicted in this photograph as "ANT," who is the owner of Jack's Executive Bistro. Specifically, SOI #1 stated that in October 2022, SOI #1 went to Jack's Executive Bistro approximately four times with NICHOLSON, at which time NICHOLSON brought approximately two to three kilograms of cocaine into the bar each time. SOI #1 stated SOI #1 remained in the car while NICHOLSON went inside on each time except for the first delivery when SOI #1 went into the bar. Furthermore, SOI # 1 stated that SOI #1 went back to Jack's Executive Bistro a few days after the first two cocaine deliveries with NICHOLSON and/or NICHOLSON and OXLEY SR. to pick up the drug proceeds.

14. Beginning in June of 2023, SOI #1 made statements against SOI #1's penal interest. The information provided by SOI #1 is consistent with evidence gathered during the course of this investigation where SOI #1 was not used, and much of SOI #1's information has been corroborated through independent investigation, including law enforcement records, toll records, and surveillance. SOI #1's criminal history includes convictions for felon in possession of a firearm, bail jumping felony, possess with intent

to distribute THC, and possess with intent to distribute THC. SOI #1 is cooperating in exchange for consideration related to SOI #1's involvement in narcotics trafficking (charges not currently pending). Finally, SOI #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein, unless otherwise noted. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI #1 is credible and SOI #1's information reliable.

15. On or about August 24, 2023, under the direction and control of case agents, a confidential source (CS) arrived at Jack's Executive Bistro and purchased approximately 500 grams of cocaine from WILKS. The controlled buy occurred in a separate room inside Jack's Executive Bistro. After obtaining the cocaine from WILKS, the CS gave the cocaine to authorities.[2]

16. Beginning in January of 2023, the CS made statements against the CS's penal interest. The information provided by the CS is consistent with evidence gathered

[2] Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant purchases drugs from the target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.

during the course of this investigation where the CS was not used, and much of the CS's information has been corroborated through independent investigation, including law enforcement records and toll records, as well as a controlled purchase of controlled substances. The CS is cooperating for consideration relating to law enforcement activity that exposes the CS to drug trafficking charges and firearm charges, which charges have not yet been filed or presented to a grand jury. The CS's criminal history includes convictions for conspiracy to possess with intent to distribute and to distribute cocaine, battery, resisting or obstructing an officer (3 counts), keeping a drug house, disorderly conduct, possession of marijuana (2nd offense), and escape. The CS also has juvenile convictions. Finally, the CS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe the CS is credible and the CS's information reliable.

17. Case agents subjected a sample of the suspected cocaine to a 07 Scott Reagent Test and received a presumptive positive result for the presence of cocaine.

**Subject Vehicle 3**

18. According to Wisconsin Department of Transportation records, **Subject Vehicle 3** lists to Tamera Denise MONTGOMERY at 1608 N. 10th Street, Milwaukee, Wisconsin. Per **Subject Vehicle 3's** Wisconsin Certificate of Title, **Subject Vehicle 3** was issued to MONTGOMERY on July 30, 2021. SOI #1 stated that **Subject Vehicle 3** was used by the DTO. SOI #1 stated that SOI #1 has been to Jack's Executive Bistro

approximately three to four times to distribute narcotics or pick up illicit drug proceeds while using **Subject Vehicle 3**. SOI #1 also stated MONTGOMERY worked alongside OXLEY SR. to facilitate the distribution of narcotics. SOI #1 stated that MONTGOMERY purchased approximately five firearms for the WILKS DTO and is known to transport drug proceeds and narcotics for the DTO. SOI #1 stated that MONTGOMERY carries drug proceeds and narcotics through the airport, typically in a larger suitcase or a black backpack. When asked how many times MONTGOMERY has transported narcotics or drug proceeds for the DTO, SOI #1 stated, "Couldn't even count how many times" and stated more than twenty times. SOI #1 stated that MONTGOMERY is also known to operate a **grey Ford Explorer** (**Subject Vehicle 3**). SOI #1 stated that MONTGOMERY was with SOI #1 on approximately two or three of the occasions to distribute narcotics or pick up illicit drug proceeds from Jack's Executive Bistro.

19. On or about October 21, 2023, case agents received flight information from American Airlines regarding a booking reservation for MONTGOMERY and OXLEY SR. The information reflected that both MONTGOMERY and OXLEY SR. booked a flight departing ORD to Las Vegas International Airport. Court-authorized GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was parked in the vicinity of ORD during the duration of MONTGOMERY and OXLEY SR.'s trip.

20. On or about October 28, 2023, OXLEY SR. and MONTGOMERY flew from Los Angeles International Airport to ORD. Upon arrival, at approximately 7:45 a.m., case agents observed via GPS data **Subject Vehicle 3** northbound on I-94 from ORD. Case

agents responded to conduct physical surveillance and observed **Subject Vehicle 3** on I-94 in Milwaukee County. Case agents also observed a black female operating the vehicle, but were unable to positively identify the driver. Case agents observed a second vehicle following close behind. The second vehicle was a grey Nissan Rouge, bearing Illinois Registration FP200531. A registration check reflects the vehicle is listed to a PV Holding Corp, with an address for ORD. Case agents submitted an administrative subpoena for rental records regarding the Nissan Rogue bearing Illinois Registration FP200531, which records reflected the vehicle was rented by OXLEY SR. on October 28, 2023. While conducting surveillance, case agents observed **Subject Vehicle 3** and the Nissan Rouge exit the interstate at West Howard Avenue. However, both vehicles did not turn onto West Howard Avenue, but instead re-entered the interstate.

21. Based on your affiants' training, experience, and familiarity with the case, your affiant knows that narcotics traffickers may operate two vehicles in tandem to facilitate the movement of drugs and/or proceeds with a decreased possibility of getting traffic stopped and/or so that certain individuals can distance themselves from any incriminating evidence. Furthermore, your affiant also knows based on their training and experience that narcotics traffickers also drive in a manner that would help them determine if they are being followed or surveilled, i.e., counter surveillance.

22. On November 6, 2023, at approximately 7:28 p.m., WILKS was observed via electronic surveillance arriving at Jack's Executive Bistro. On this same day, at approximately 8:30 p.m., while conducting electronic surveillance, case agents observed

**Subject Vehicle 3** arrive at Jack's Executive Bistro, after which a female matching the physical descriptors for MONTGOMERY and an unknown male (UM 1) exited **Subject Vehicle 3**. Based on your affiant's familiarity with the case, your affiant believes MONTGOMERY was operating the **Subject Vehicle 3** on that day at Jack's Executive Bistro. Case agents then observed MONTGOMERY and UM 1, carrying a backpack that was retrieved from the **Subject Vehicle 3**, enter Jack's Executive Bistro. MONTGOMERY and UM 1 remained inside in Jack's Executive Bistro for approximately 3 minutes. After MONTGOMERY and UM 1 exited Jack's Executive Bistro, case agents observed UM 1 put the backpack in the backseat area of **Subject Vehicle 3**. Subsequently, case agents observed UM 1 enter the front passenger seat of the **Subject Vehicle 3** and observed MONTOGMERY enter the driver seat of the **Subject Vehicle 3**, and they subsequently departed Jack's Executive Bistro.

23. On November 7, 2023, at approximately 8:43 p.m., while conducting electronic surveillance, case agents observed **Subject Vehicle 3** arrive at Jack's Executive Bistro. Case agents observed MONTGOMERY and UM 1, who was carrying a large backpack, attempt to enter Jack's Executive Bistro, but stopped just inside the door. Case agents then observed MONTGOMERY and UM 1 walk back to **Subject Vehicle 3**. At approximately 8:47 p.m., case agents observed WILKS arrive at Jack's Executive Bistro. At approximately the same time, case agents observed MONTGOMERY and UM 1, who was again carrying a large backpack, exit **Subject Vehicle 3** and make contact with WILKS. Shortly after, WILKS, MONTGOMERY, and UM 1 entered Jack's Executive

Bistro. At approximately 9:04 p.m., case agents observed MONTGMERY and UM 1 exit Jack's Executive Bistro. UM1 was observed carrying the large backpack upon exiting Jack's Executive Bistro. Case agents observed UM 1 place the large backpack in the rear passenger seat of **Subject Vehicle 3** and enter the front passenger seat of the **Subject Vehicle 3**. At approximately the same time, case agents observed MONTGOMERY enter the driver seat of **Subject Vehicle 3**. At approximately 9:05 p.m., case agents observed **Subject Vehicle 3** depart Jack's Executive Bistro. Based on their training, experience, and familiarity with this investigation, case agents believe that on November 6 and 7, 2023, MONTGOMERY and UM 1 met at Jack's Executive Bistro to conduct narcotics activity, i.e., supply narcotics and/or pick up drug proceeds.

24. On February 20, 2024, at approximately 9:17 p.m., electronic surveillance reflected a grey Ford Explorer arrive in the parking lot of Jack's Executive Bistro. GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was in the parking lot of Jack's Executive Bistro on February 20, 2024, at approximately 9:19 p.m. Additionally, cellular data for OXLEY SR.'s phone, (310) 760-1161 (Target Cell Phone 2) reflected Target Cell Phone 2 was in the general vicinity of Jack's Executive Bistro on February 20, 2024, at approximately 9:25 p.m., with an approximate ping radius of 4,043 meters. At approximately 9:32 p.m., case agents observed OXLEY SR. enter Jack's Executive Bistro. At approximately 9:34 p.m., location data for Target Cell Phone 2 reflected Target Cell Phone 2 was in the general vicinity of Jack's Executive Bistro with an approximate ping radius of 364 meters. Due to technical issues with the electronic surveillance, case agents

were unable to observe OXLEY SR. exiting Jack's Executive Bistro. At approximately 9:54 p.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro.

25. On February 21, 2024, at approximately 12:22 a.m., electronic surveillance at Jack's Executive Bistro reflected a grey Ford Explorer arrive at Jack's Executive Bistro. GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was in the parking lot of Jack's Executive Bistro on February 21, 2024, at approximately 12:23 a.m. Additionally, cellular data pertaining to Target Cell Phone 2 reflected that Target Cell Phone 2 was in the general vicinity of Jack's Executive Bistro on February 21, 2024, at approximately 12:25 a.m., with an approximate ping radius of 3,339 meters. Due to the positioning of electronic surveillance, case agents could not observe any individuals exit and or enter the grey Ford Explorer. However, based on electronic surveillance, location data for Target Cell Phone 2, and GPS data for **Subject Vehicle 3**, case agents believe OXLEY SR. was operating **Subject Vehicle 3** at Jack's Executive Bistro on this day. At approximately 12:44 a.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro.

26. Based on case agents' training and experience, case agents believe that due to the shorter duration of OXLEY SR.'s visits to Jack's Bistro on February 20 and 21, 2024, as well as OXLEY SR.'s role in supplying WILKS with narcotics, OXLEY SR. went to the bar to engage in narcotics transactions and/or to discuss narcotics trafficking.

27. On February 22, 2024, at approximately 10:30 p.m., electronic surveillance at Jack's Executive Bistro reflected a grey Ford Explorer arrive at Jack's Executive Bistro. GPS data for **Subject Vehicle 3** reflected that on February 22, 2024, at approximately 10:30

p.m., **Subject Vehicle 3** was in the parking lot of Jack's Executive Bistro. At approximately 10:32 p.m., case agents observed OXLEY SR. exit the grey Ford Explorer and walk towards Jack's Executive Bistro, but were unable to observe OXLEY SR. enter the establishment. Additionally, location data for Target Cell Phone 2 reflected that Target Cell Phone 2 was in the general vicinity of Jack's Executive Bistro on February 22, 2024, at approximately 10:35 p.m., with an approximate ping radius of 364 meters. At approximately 10:47 p.m., case agents observed OXLEY SR. exit Jack's Executive Bistro with WILKS. Shortly after, case agents observed OXLEY SR. enter the driver side door of the grey Ford Explorer and depart Jack's Executive Bistro.

28. At approximately 11:58 p.m., case agents observed the grey Ford Explorer arrive at Jack's Executive Bistro again. GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was in the parking lot of Jack's Executive Bistro on February 22, 2024, at approximately 11:58 p.m. Additionally, cellular data for Target Cell Phone 2 reflected that Target Cell Phone 2 was in the general vicinity of Jack's Executive Bistro on February 23, 2024, at approximately 12:06 a.m., with an approximate ping radius of 364 meters. On February 23, 2024, at approximately 12:36 a.m., case agents observed the grey Ford Explorer depart Jack's Executive Bistro.

29. Location data for Target Cell Phone 2 and GPS data for **Subject Vehicle 3** leads case agents believe OXLEY SR. was operating **Subject Vehicle 3** and was at Jack's Executive Bistro on February 22, and February 23, 2024. Additionally, based on case agents' training and experience, the short duration of OXLEY SR.'s visits on February 22

and 23, 2024, at Jack's Executive Bistro lead case agents to believe OXLEY SR. went to the establishment to engage in narcotics transactions and/or to discuss narcotics trafficking.

30. On March 7 and March 8, 2024, GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was at Jack's Executive Bistro on both dates for approximately less than an hour on each occasion. Due to the angle of electronic surveillance, case agents could not observe who was operating **Subject Vehicle 3** on these days. However, on March 8, an individual believed to be OXLEY SR. was observed at Jack's Bistro around the time **Subject Vehicle 3** was there. Based on their training, experience, and familiarity with this investigation, case agents believe that the short duration of trips to Jack's Executive Bistro is indicative of narcotics-trafficking meetings and/or transactions.

31. On March 21, 2024, aided with location data for Target Cell Phone 2 and GPS data for **Subject Vehicle 3**, case agents located **Subject Vehicle 3** parked near the Buckler Apartments located at 401 W. Michigan Street, Milwaukee, WI. At approximately 5:27 p.m., case agents observed OXLEY SR., OXLEY JR., and Ryan COLON (DOB: x/xx/2004) exit the apartment complex and enter **Subject Vehicle 3**. COLON was observed entering **Subject Vehicle 3** with a backpack. Surveillance footage from the Buckler Apartments on this day (obtained via administrative subpoena) reflected an unidentified male waiting near the door to the apartment complex. Case agents then observed the unidentified male opening the door to the Buckler Apartments for OXLEY SR., OXLEY JR., and COLON, who was observed wearing a backpack. Buckler Apartment staff stated that the unidentified male who gave OXLEY SR., OXLEY JR., and

COLON access to the property is not leasing an apartment unit, but is currently staying in unit 106. Based on case agents' familiarity with the investigation, case agents believe that OXLEY SR., OXLEY JR., and COLON were at the apartment complex to engage in narcotics transactions and/ or discuss narcotics trafficking.

32. On March 22, 2024, GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was at the Milwaukee International Airport from approximately 5:49 a.m. to approximately 5:52 a.m. On the same day, case agents spoke to Milwaukee County Sheriff's Department Duties regarding surveillance footage. While reviewing surveillance footage, case agents observed COLON exit **Subject Vehicle 3** and travel through the airport. Case agents subsequently administered a subpoena to American Airlines, and results reflected COLON had a scheduled flight on March 22, 2024, from Milwaukee to Dallas Fort-Worth (AA# 2621) and had a connecting flight from Dallas Fort-Worth to Los Angeles (AA#1706).

33. On April 5, 2024, GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was northbound towards Wisconsin. Case agents subsequently established surveillance at the Mariner Apartment Complex, Apartment #15 (an apartment used by the DTO). At approximately 3:18 p.m., while conducting physical surveillance, case agents observed NICHOLSON JR. near **Subject Vehicle 3** in the parking lot of the Mariner Apartment Complex. Case agents subsequently observed what appeared to be NICHOLSON JR. remove the following items from **Subject Vehicle 3**: a black backpack, a black roller style bag, a blue laptop style bag, and a black ballistic style vest with a

security patch. Case agents subsequently observed NICHOLSON JR. enter Apartment #15 at the Mariner Apartment Complex.

34. On April 9, 2024, GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was at ORD and subsequently travelled northbound towards the Mariner Apartment Complex. At approximately 9:01 a.m., while conducting physical surveillance, case agents observed NICHOLSON JR. walk towards Apartment #15 at the Mariner Apartment Complex and subsequently enter. It appeared to case agents that NICHOLSON JR. used keys to access Apartment #15. On the same day, at approximately 3:12 p.m., case agents observed WILKS arrive at Jack's Executive Bistro. At approximately 3:31 p.m., GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was at Jack's Executive Bistro. Additionally, electronic surveillance confirmed both **Subject Vehicle 3** and NICHOLSON JR., were at Jack's Executive Bistro. Through electronic surveillance, case agents observed NICHOLSON JR. enter Jack's Executive Bistro. NICHOLSON JR. remained in Jack's Executive Bistro for approximately 12 minutes. Case agents then observed WILKS and NICHOLSON JR. exit Jack's Executive Bistro and subsequently depart in separate vehicles. Operational hours for Jack's Executive Bistro reflect that the establishment is closed on Mondays and Sundays, open from 4:00 p.m. to 1:30 a.m. on Tuesday, Wednesday, and Thursday, and open from 4:00 p.m. to 2:00 a.m. on Friday and Saturday. Therefore, this meeting occurred during non-operational hours. Based on their training, experience, and familiarity with this investigation, case agents believe that the

short duration trip to Jack's Executive Bistro after returning from ORD is indicative of a narcotics-trafficking meeting and/or transaction.

35. On May 12, 2024, at approximately 11:34 p.m., GPS data for **Subject Vehicle 3** reflected that **Subject Vehicle 3** was at Jack's Executive Bistro. Electronic surveillance at Jack's Executive Bistro depicted NICHOLSON JR. exit **Subject Vehicle 3** and walk to the entrance of Jack's Executive Bistro. After arriving at the entrance to the Bistro, NICHOLSON JR. did not go in. Rather, he walked back to and re-entered **Subject Vehicle 3** and departed. It appeared to case agents that WILKS was not at Jack's Executive Bistro at that time. Case agents believe NICHOLSON JR. did not enter Jack's Executive Bistro because WILKS was not present, leading case agents to believe that NICHOLSON JR. went to Jack's Executive Bistro to conduct a narcotics-trafficking meeting and/or transaction.

**Movement of Narcotics via Commercial Airlines and Cocaine Seizure**

36. During the course of this investigation, law enforcement agents have identified individuals employed by the Transportation Security Administration (TSA) and by the LAX airport that case agents suspect are involved in smuggling narcotics from LAX to ORD, before the narcotics are eventually brought to Milwaukee for distribution. Phone records and surveillance footage has led agents to determine that Stephen M. REESE (DOB: xx/xx/1978), an employee at the LAX airport, and California-based TSA employee Jasmine STEWART are assisting the DTO by bringing suspected controlled substances into LAX and thereafter providing the controlled substances to other DTO

members who fly them to ORD. Further, over the course of the investigation, case agents identified Kristen L. CENDEJAS (x/x/1990) and Michelle CARTER as members of the OXLEY SR. DTO that facilitate the movement of narcotics through commercial air travel. Furthermore, SOI#1 has positively identified both CARTER and CENDEJAS. SOI#1 has identified CARTER as OXLEY SR.'s "other lady" and CENDEJAS as "Kristen."

37. Case agents reviewed footage from LAX and ORD on April 11, 2024. Surveillance footage from LAX depicted REESE meet with CENDEJAS at approximately 4:14 a.m. PST, and the two appeared to exchange backpacks.

38. Preceding this meeting, on April 10, 2024, at approximately 11:54 p.m. CST, OXLEY SR., using phone number (760) 447-4257, was in contact with STEWART. Additionally, on Thursday, April 11, 2024, at 10:16 a.m., 10:36 a.m., 1:01 p.m., 1:24 p.m., and 1:46 p.m., NICHOLSON JR., using phone number (562) 253-6441, and at 10:23 a.m. and 1:13 p.m., OXLEY SR. ((760) 447-4257), were in communication with CARTER at phone number (414) 888-9090. Additionally, at approximately 2:36 a.m. and at 5:08 a.m., OXLEY SR. ((760) 447-4257) was in contact with CENDEJAS at phone number (323) 675-7829.

39. On April 11, 2024, at approximately 10:58 a.m., GPS data reflected **Subject Vehicle 3** traveled to a Milwaukee-area residence associated with CARTER. **Subject Vehicle 3** then traveled southbound on I-94 to ORD, at which time case agents physically observed **Subject Vehicle 3**.

40. At approximately 12:26 p.m., case agents observed **Subject Vehicle 3** parked in terminal 2 at ORD. At that point, case agents did not observe anyone enter or exit **Subject Vehicle 3**. **Subject Vehicle 3** subsequently left terminal 2 and stopped at terminal 3, prior to departing ORD and ultimately going to the Fashion Outlets of Chicago located at 5220 Fashion Outlets Way, Rosemont, IL.

41. However, surveillance footage from ORD reflected CARTER being dropped off by **Subject Vehicle 3** at terminal 2, at which point CARTER entered ORD and subsequently met with CENDEJAS inside an airport bathroom at ORD at approximately 12:39 p.m. CARTER entered the bathroom with what appeared to be an empty backpack and exited carrying a backpack that contained items. Case agents believe that CARTER and CENDEJAS switched backpacks. CARTER then re-entered **Subject Vehicle 3** and left the area.

42. Telephone toll analysis revealed that at approximately 12:39 p.m., CARTER ((414) 888-9090) placed an outgoing call to CENDEJAS ((323) 675-7829). At approximately 1:01 p.m., CARTER ((414) 888-9090) received an incoming call from NICHOLSON JR., ((562) 253-6441). At approximately 1:13 p.m., CARTER ((414) 888-9090) placed an outgoing call to OXLEY SR. ((760) 447-4257). Additional telephone toll analysis revealed that at approximately 1:24 p.m., CARTER ((414) 888-9090) placed another outgoing call to CENDEJAS ((323) 675-7829). At approximately 1:25 p.m. and 1:46 p.m., CARTER ((414) 888-9090) placed outgoing calls to NICHOLSON JR. ((562) 253-6441).

43. At approximately 1:46 p.m., **Subject Vehicle 3** re-entered arrivals at ORD and drove through slowly prior to departing the airport and driving north towards Milwaukee, WI. Case agents were unable to continuously follow **Subject Vehicle 3** north towards Milwaukee, WI area but they continued to monitor the GPS data and established surveillance on **Subject Vehicle 3** as it approached the Milwaukee, WI, area.

44. At approximately 3:31 p.m., case agents observed **Subject Vehicle 3** stop in front of CARTER's Milwaukee-area residence, at which time CARTER exited the vehicle without a backpack. After dropping off CARTER, **Subject Vehicle 3** stopped at Walgreens, then traveled directly to the Mariner Apartment. Upon arrival, case agents observed NICHOLSON JR. walk from the direction of **Subject Vehicle 3** towards apartment #15 at the Mariner apartment complex, carrying a black backpack.

45. Based on the aforementioned toll analysis, in conjunction with physical and electronic surveillance, case agents believe OXLEY SR. communicated with members of the DTO to facilitate illegal narcotics to get through airport security at LAX. Case agents believe that REESE brought the narcotics in the black backpack, thereby bypassing airport security. Once the narcotics bypassed airport security, REESE met CENDEJAS to facilitate the transfer of narcotics. Once the transfer was complete, CENDEJAS then flew the narcotics from LAX to ORD via United Airlines flight #1332. OXLEY SR. also communicated with CARTER, who coordinated with NICHOLSON JR., to travel to ORD to meet with CENDEJAS. Upon arrival at ORD, CARTER entered the airport at which point case agents believe CARTER obtained the black backpack containing narcotics from

CENDEJAS. CARTER then traveled back to Milwaukee with NICHOLSON JR. in **Subject Vehicle 3**. After NICHOLSON JR. dropped CARTER off at a residence associated with CARTER, NICHOLSON JR. then returned to the Marnier Apartment Complex with the backpack containing the narcotics.

46. On May 29, 2024, aided with GPS data for **Subject Vehicle 3**, case agents conducted physical surveillance on **Subject Vehicle 3**. While conducting surveillance, case agents observed Christian FRAZIER (DOB: xx/xx/1990) driving **Subject Vehicle 3** and observed CENDEJAS as a passenger in **Subject Vehicle 3**. While monitoring GPS data for **Subject Vehicle 3**, case agents observed **Subject Vehicle 3** at the Milwaukee Mitchell International Airport. Case agents subsequently travelled to the airport and established surveillance inside. While conducting surveillance in the airport, case agents located CENDEJAS. Case agents were unaware of any scheduled flights for CENDEJAS on that day.

47. During the morning hours of June 4, 2024, court-authorized location data for OXLEY SR.'s phone and CARTER's phone revealed both traveled from Milwaukee to the area of ORD, seemingly together. At approximately 6:32 a.m., OXLEY SR.'s phone and at 6:38 a.m., CARTER's phone were in the immediate vicinity of ORD. As time passed, OXLEY SR.'s phone traveled northbound to Milwaukee while CARTER's phone remained at ORD. Therefore, case agents believed OXLEY SR. drove CARTER to ORD so she could take a flight while he returned to Milwaukee.

48. Flight records and location data for CARTER's phone revealed CARTER, after a brief layover at the Salt Lake City International Airport, flew into the Long Beach (CA) Airport at approximately 2:07 p.m.

49. Later that same day, at approximately 8:05 p.m. and 8:06 p.m. PST, REESE, at (323) 812-2879, received calls from FNU LNU using (669) 322-6506. Beginning at approximately 8:37 p.m. PST, CARTER's phone was in the immediate vicinity of LAX where it stayed. At approximately8:43 p.m. PST, REESE's phone was also in the immediate vicinity of LAX until approximately 9:51 p.m. PST. At approximately 8:52 p.m., 9:01 p.m., and 9:13 p.m. PST, REESE, using (323) 812-2879, called FNU LNU at (669) 322-6506.

50. As with the April 11, 2024 exchange between REESE and CENDEJAS, case agents believe REESE was in telephone contact with FNU LNU at (669) 322-6506 to coordinate the exchange of a backpack containing narcotics with CARTER.

51. Case agents contacted an American Airlines employee who advised that CARTER had a reservation to depart on American Airlines flight 1564, LAX – Chicago, IL (ORD) – Pittsburg (PIT), with a delayed departure time of 1:12 a.m. (which would be on June 5, 2024), from Terminal 5, gate 53A.

52. Case agents also contacted Los Angeles World Airport (LAWA) Badging office, who advised that REESE had used his LAWA-issued badge to enter through Los Angeles World Airport ACAMS doors that lead to the Terminal 6 departure level. However, REESE was supposed to be on a day off from his work shift at LAX.

53. Case agents reviewed surveillance footage from within LAX and observed the following:

a. At approximately 9:03 p.m. PST, REESE was in the area of elevator T6-9, lower-level / tunnel area. REESE was observed to be in possession of a black colored backpack and sat near the area of Gate 67.

b. At approximately 9:10 p.m. PST, CARTER completed the Transportation Security Administration (TSA) screening process. CARTER was in possession of a black colored "SwissGear" Scan Smart TSA laptop backpack.

c. At approximately 9:14 p.m. PST, case agents observed CARTER reach the area of elevator T6-9. REESE, while in possession of the dark colored backpack, appeared to see CARTER near the elevator, then walked through a door that leads to the lower-level / tunnel area. Approximately a few seconds later, CARTER walked into elevator T6-9, which also leads to the lower level / tunnel area.

d. At approximately 9:16 p.m. PST, REESE took the escalator from the lower-level tunnel area to the departure level. REESE was then observed walking northbound through the departure level and eventually exited the terminal and walked to the area of the LAX parking structure P5 / P6. Surveillance footage captured that REESE was in possession of a similar backpack (black colored "SwissGear" Scan Smart TSA Laptop backpack) as CARTER's. Based on the zipper configuration on the backpack it appeared to be the same backpack CARTER possessed before meeting with REESE in the lower level / tunnel area.

e. At approximately 9:16 p.m. PST, CARTER walked from the same area where REESE took the escalator, lower-level / tunnel area. Surveillance footage captured CARTER's black colored "SwissGear" Scan Smart TSA Laptop backpack, which appeared to be different than before meeting REESE. It appeared to case agents that the backpack was now weighed down and the zipper configuration was not the same.

54. Based on their familiarity with this investigation, case agents believed REESE and CARTER swapped backpacks.

55. At approximately 11:20 p.m. PST, case agents responded to Terminal 5, Gate 53, to locate CARTER before her departure flight. Case agents located CARTER laying down on the ground behind the American Airlines ticket counter near Gate 53A. Case agents then observed what appeared to be the same black colored "SwissGear" backpack from surveillance footage, which was sitting on the ground, approximately 6 inches away from CARTER. No other passengers were in the immediate area of the backpack.

56. At approximately 11:48 p.m. PST, case agents exposed narcotic detection K-9 "Casey" to the general area where CARTER was laying down. Case agents advised that K-9 "Casey" had alerted to the black colored "SwissGear" backpack sitting next to CARTER. Case agents, who were in plainclothes, approached CARTER. Case agents tapped CARTER on her shoulder to wake her up. Case agents displayed to CARTER their DEA credentials and identified as law enforcement. Case agents explained to CARTER that a K-9 had alerted to the scent of narcotics coming from her black colored "SwissGear" backpack that was sitting next to her. Case agents asked CARTER if she was willing to accompany them to the LAXNTF office to discuss the contents inside her black colored "SwissGear" backpack. CARTER stood up, picked up her black colored handbag with multicolor lettering and the black colored "SwissGear" backpack and agreed to walk back to the LAXNTF office. While walking to the LAXNTF office, CARTER maintained possession of her handbag and backpack. CARTER asked case agents how long it would take because she needed to get back to her child and her sick mother. Case agents

explained to CARTER that it was a 5-minute walk to the LAXNTF office.

57. While at the LAXNTF office, case agents explained to CARTER that a narcotic K-9 had shown interest on her backpack. Case agents asked for consent to search the bags in her possession. CARTER verbally agreed and signed a DEA Consent Form giving case agents consent to search her bags.

58. Case agents searched the black colored handbag with multicolored lettering and discovered it contained miscellaneous women's clothing, toiletries and shoes. The Handbag also contained two Delta Airlines boarding passes dated June 4, 2024, for Delta flight 2426, ORD – SLT and Delta flight 855, SLT – Long Beach, both under the name of "CARTER/MICHELLE."

59. Case agents searched a pink colored coin purse which contained a Wisconsin Identification Card No. C636-5419-7808-09 and Visa Debit Card, both under the name of Michelle CARTER.

60. Case agents searched the black colored "SwissGear" backpack. Case agents opened the main compartment of the backpack and discovered 10 kilogram-sized vacuum-sealed packages. As an officer was taking out each vacuum-sealed package, CARTER spontaneously stated the following: "what the fuck is that, that is not my bag", "what is that, that's drugs, that's what the dog was smelling." CARTER claimed she had shopping bags and items from Ross, Walmart, and Target. CARTER also said, "What is that, that don't look like no weed."

61. Field testing revealed that the white powdery substance tested positive for

Cocaine Hydrochloride. In total, the cocaine weighed approximately 11.76 kilograms (including the packaging).

**Subject Vehicle 3 – Infotainment System**

62. Since June 2024, case agents have conducted several interviews of SOI #10. SOI #10 advised s/he has flown to locations throughout the United States at the request and direction of OXLEY SR. If SOI #10 flew to Los Angeles, CA, SOI #10 believed s/he was transporting bulk U.S. currency to be delivered to either OXLEY SR. or an associate of OXLEY SR. in California. If SOI #10 flew from Los Angeles, CA, SOI #10 believed s/he was transporting illegal drugs or U.S. currency from California to other locations.

63. SOI #10 also advised that s/he had been a passenger in **Subject Vehicle 3** numerous times in the past while OXLEY SR., FRAZIER, NICHOLSON, and others were driving **Subject Vehicle 3**. SOI #10 said that most times while s/he was a passenger in **Subject Vehicle 3**, s/he observed that the driver of **Subject Vehicle 3's** had his or her phone synced to **Subject Vehicle 3's** infotainment and telematics systems. If the driver of **Subject Vehicle 3** made or received a telephone call, the caller ID would appear on **Subject Vehicle 3's** infotainment screen display.

64. On approximately June 21, 2024, GPS data pertaining to **Subject Vehicle 3** revealed it traveled from 410 E. Ship Street to 4030 W. Douglas Avenue, Milwaukee, WI, which case agents knew to be a tow yard. By July 17, 2024, **Subject Vehicle 3** had still not moved from the tow lot. Case agents traveled to the tow lot and made contact with staff who advised that the owner of **Subject Vehicle 3** had 30 days to claim their vehicle

before forfeiture proceedings began. The tow lot had Tamera MONTGOMERY listed in their files as the owner of **Subject Vehicle 3**.

65. On August 26, 2024, case agents again responded to the tow lot and made contact with staff. They advised that nobody had come forward to reclaim **Subject Vehicle 3**, and **Subject Vehicle 3** was repossessed by the lien holder on **Subject Vehicle 3's** title, Carvana, LLC. Carvana subsequently had **Subject Vehicle 3** towed to Copart, 9201 N. 107th Street, Milwaukee, WI on August 26, 2024, for future auctioning.

66. Case agents spoke with a manager of Copart who advised that it would maintain custody of **Subject Vehicle 3** in a secured area and will not modify the internal computer system of **Subject Vehicle 3** in any manner, pending case agents' attempt at securing this warrant. Furthermore, the manager advised that **Subject Vehicle 3** would remain locked and that nobody would enter it, but that he would allow case agents to access **Subject Vehicle 3** if a search warrant was obtained.

67. **Subject Vehicle 3** is a **2018 Gray Ford Explorer** bearing VIN number **1FM5K7D87JGB28071**, and it is equipped with infotainment and telematics systems. Using the Berla iVe mobile application, law enforcement looked up the available data using **Subject Vehicle 3's** VIN number, which search reflected that the available data for **Subject Vehicle 3's** includes "Connections," "Devices," "Events," "Navigation," and "System Metadata." As described in detail below, electronic data, information, and images stored on these systems may be successfully extracted from **Subject Vehicle 3** using proprietary hardware and software.

68. Currently, **Subject Vehicle 3** is located at 9201 N. 107th Street, Milwaukee, Wisconsin. **Subject Vehicle 3** was repossessed by Carvana, LLC and subsequently towed to 9201 N. 107th Street where it remains locked in a secured lot.

## <u>TECHNICAL BACKGROUND REGARDING THE VEHICLE AND ITS INFOTAINMENT AND TELEMATICS SYSTEMS</u>

69. Based on my training and experience, as well as discussions with other experienced law enforcement officers and witnesses, I have learned that:

a. Many modern motor vehicles are equipped with sensors, cameras,[3] transmitters, and electronic control units (ECUs)[4] to monitor and manage vehicle operations, track vehicle movement, and exchange information with other vehicles and infrastructure.[5] These systems also enable motor vehicles to interface with various types of mobile devices to facilitate the use of applications, including third-party navigation,

---

3 As of 2018, the US National Highway Safety Transportation Agency requires new motor vehicles sold in the United States to have backup cameras installed by the manufacturer.

4 "ECU" is a generic term applied to any embedded computer that controls one or more electrical systems within a vehicle. ECUs are typically installed in a vehicle by the original equipment manufacturer during the manufacturing process. There are many types of ECUs, and as vehicles have more features each year, the number of ECUs in each motor vehicle increases. Newer motor vehicles can integrate as many as 150 ECUs, ensuring, in theory, that each part of the motor vehicle is running properly. Some examples of common ECUs include the Engine Control Module, Transmission Control Module, Brake Control Module, and Suspension Control Module, as well as the Telematics Control Unit and Infotainment Control Unit.

5 The infotainment and telematics systems in motor vehicles are not the same as "black box" recorders. Black box recorders are called event data recorders (EDRs) or crash data recorders. These black box recorders can record vehicle speed, engine speed, steering angle, throttle position, braking status, force of impact, seatbelt status, and airbag deployment. In 2006, the US National Highway Traffic Safety Administration (NHTSA) adopted regulations requiring EDRs to uniformly collect certain crash data to assist crash investigators with accident reconstruction efforts. In 2012, NHTSA proposed requiring manufacturers to install EDRs in all new cars and trucks, but in 2019, the NHTSA withdrew the proposal because automakers have voluntarily installed the devices in nearly all vehicles.

wireless telephone, multimedia streaming, and the like. To perform these computing functions, modern motor vehicles collect, process, and store significant volumes of data.

b. Two commonly installed ECUs within motor vehicles are infotainment and telematics systems—sometimes referred to as the Telematics Control Unit and the Infotainment Control Unit. These systems typically retain large amounts of user data within the vehicle.

c. A vehicle's infotainment system combines hardware and software to provide entertainment features. Many infotainment systems allow drivers and passengers to connect their handheld electronic devices to the vehicle. When connected, the driver and/or passengers may gain access to, for example, Global Positioning System (GPS) navigation, video players, music streaming, voice calling, texting, and traffic data. Many systems enable talking hands-free with Bluetooth connectivity, listening to music, watching videos, or pulling up a mapped route to a destination. Many of these features are accessible via the (usually interactive) console located on the front dashboard of the vehicle.

d. A vehicle's telematics system typically collects and stores diagnostic data from various systems (other ECUs) within the vehicle, including historical navigation points, speed, and event data. Historical event data may include information regarding when the car's trunk, doors, and windows opened and closed, when headlights turned on and off, and when gears changed or brakes were engaged.

e. The main difference between the infotainment and telematics systems is that the infotainment system is about entertainment for the occupants of the vehicle, and the telematics system is for collecting and reporting (transmitting) information—such as vehicle use data, maintenance requirements, and automotive servicing—about the vehicle. Typical telematics data may include turn-by-turn navigation, remote access, emergency calling, and maintenance notifications. Examples of vehicle telematics systems include General Motors' OnStar, BMW's "Assist," and Mercedes' "mbrace." Some of these systems are integrated multimedia navigation and telematics systems in one (combined infotainment/telematics systems), like Toyota's "Entune" and Ford's "Sync."

f. The data generated, collected, transmitted, and retained by motor vehicles can provide valuable information in law enforcement investigations of crimes. For example, many infotainment systems

support the importation of content and other data information from a particular user's mobile device. Such data may include content that may provide attribution to particular user(s), including mobile device identifiers, wireless telephone numbers, user account details, passwords, user voice profiles, contact lists, call logs, text messages, pictures, e-mail, videos, web history, GPS coordinates, and other historical navigation information.

g. I am aware that the computers (ECUs) within many motor vehicles store data for prolonged periods of time. Furthermore, even after a previously-connected mobile device is removed from the physical vehicle, data may remain within the digital storage of the system. Such stored data can be used to identify locations, victims, witnesses, associates, and co-conspirators and may include communications and images of criminal activity. In sum, a forensic examination of a motor vehicle's infotainment and telematics systems may reveal the vehicle's GPS location information, movements, operations, and user data at critical moments before, during, and after the commission of a crime.

h. As previously stated, **Subject Vehicle 3** is a **2018 Ford Explorer.** To complete a forensic extraction from **Subject Vehicle 3**, it may be necessary, temporarily, to remove trim and other components of **Subject Vehicle 3** to access the information subject to search. It may also be necessary to repair the device, replace the screen, reconnect wires, and replace batteries. It may be necessary to employ advanced forensic processes to bypass locked display screens and other data access restrictions. Advanced processes may include potentially destructive forensic techniques used to remove memory chips from computers and other electronic storage containers that may be found within **Subject Vehicle 3**. In the event that potentially destructive processes are required to perform this extraction, parts of **Subject Vehicle 3**may be destroyed and rendered useless.

i. Furthermore, it may be necessary to return to **Subject Vehicle 3** and reconnect the infotainment and telematics systems to **Subject Vehicle 3's** power source to perform the extraction using forensic software. This is because there are various computer networks working simultaneously when a vehicle is powered on, and in some vehicles, the infotainment and telematics systems require the other networks to work in tandem to complete the data extraction.

j. The requested warrant authorizes a later review of the media and information seized or copied from **Subject Vehicle 3**, which review may continue past the date required for execution of the warrant.

## CONCLUSION

70. I submit that this affidavit supports probable cause for a warrant authorizing the extraction and forensic examination of electronically stored information within **Subject Vehicle 3** (as described in Attachment A) to seize the data described in Attachment B.

71. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the owner or user of **Subject Vehicle 3** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A

***Property to be Searched***

The property to be searched is a Gray 2018 Ford Explorer, bearing VIN number 1FM5K7D87JGB28071, currently located at 9201 N. 107th Street, Milwaukee, Wisconsin ("**Subject Vehicle 3**").

This warrant authorizes, *inter alia*, the forensic examination of **Subject Vehicle 3**'s infotainment and telematics systems for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be Seized*

All electronically stored information on **Subject Vehicle 3**'s infotainment and telematics systems described in Attachment A, that involves Marcel OXLEY Sr., Christian FRAZIER, Vincent NICHOLSON, Tamera MONTGOMERY, and other DTO members who are known and unknown, and relates to violations of Title 21, United States Code, Sections 841(a)(1) (Attempted possession with intent to distribute controlled substances) and 846 (Conspiracy to distribute and possess with intent to distribute controlled substances) from July 30, 2021 through June 21, 2024, including:

1. Stored electronic data, information, images, and related digital storage, and/or vehicle diagnostic data from electronic systems within **Subject Vehicle 3**, including, but not limited to:

    a. unique device identifiers;

    b. media files;

    c. call logs;

    d. contacts;

    e. SMS;

    f. Bluetooth connections;

    g. USB connections;

    h. voice commands;

    i. voice recordings;

    j. voice calling;

    k. web browser history;

l. Wi-Fi connections;

m. speech recognition;

n. time updates;

o. track logs;

p. traction events;

q. traffic updates;

r. stop/start log;

s. GPS warnings;

t. hard acceleration;

u. hard braking;

v. light status;

w. odometer reading;

x. gear shifts;

y. historical navigation data;

z. historical speed data;

aa. historical event data; and

bb. data streaming services and related content.